# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CARNELL HUNNICUTT, SR.,

       Plaintiff,

                                      2:18-cv-00667-JB-KRS

v.

DESTINEE MOORE; RAYMOND SMITH;
GEO CORP; LCCF; M. VALERIANO;
STACEY BEAIRD; KATHERINE BRODIE;
P. VALDEZ;T. FOSTER; and GERMAN
FRANCO,

       Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

In June 2017, Plaintiff Carnell Hunnicutt, Sr., an interstate compact prisoner from Connecticut and published cartoonist then confined at the Lea County Correctional Facility in Hobbs, New Mexico, placed four letters in the prison's outgoing mail. The correspondence, two pieces of which contained cartoons portraying prison staff in unflattering ways and all of which used insulting language to describe staff, reached its intended recipients. Hunnicutt, however, lost visitation privileges as punishment for violating the prison's verbal-abuse policy. True to the promises in his letters, Hunnicutt sued the prison and responsible staff in the instant action for deprivations of his First Amendment rights and violations of state law. Before the Court is Defendants the Geo Group, M. Valeriano, Katherine Brodie, and P. Valdez's renewed motion for summary judgement filed as part of their *Martinez* report. (Doc. 40). Defendants Destinee Moore and Raymond Smith have joined in the motion. (Docs. 52; 59).

In a nutshell, Defendants contend that Hunnicutt's correspondence, while ostensibly addressed to non-inmates, was directed at prison staff to harass and abuse them. Defendants argue that such speech lacks First Amendment protection and any infringement on speech in this

case is reasonably related to important penological interests of order and rehabilitation. Defendants also maintain Hunnicutt's state-law claims fail as a matter of law. Hunnicutt argues he has a right to criticize staff and prison conditions in outgoing mail, even in vulgar terms, and did not direct his unflattering remarks and depictions at the prison staff. (Doc. 46). Pursuant to an order of reference, the Court has considered the parties' submissions and the available record. Having done so, the Court recommends Defendants' motion be **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

### A.    <u>Facts</u>

Hunnicutt was confined at LCCF from 2015 to 2018. (Doc. 46, at 2, 3). Although he is from Connecticut, Hunnicutt is incarcerated in New Mexico (now in Southern New Mexico Correctional Facility) pursuant to the Interstate Corrections Compact, which allows for the transfer of prisoners among members of the Compact. *See* N.M. Stat. Ann. §§ 31-5-17 – 31-5-19. Hunnicutt is a prolific cartoonist; he uses his cartoons to comment on prison conditions. (Doc.46). His cartoons have been featured in publications and on the internet. (*Id.*) Carol Strick has known Hunnicutt "for more than 20 years and ha[s] been exhibiting [and] selling his artwork during that time." (Doc. 46, at 94).

The GEO Group operates LCCF and oversees outgoing and incoming prisoner mail. (Doc. 40, at 629). With the overall policy to "encourage[] correspondence on a wholesome and constructive level . . . with no restrictions except those necessary to ensure the safety and security of the facility[y] and other persons," the New Mexico Department of Corrections' *Correspondence Regulations* govern the prison's oversight. (*Id.* at 326; 629). Under the regulations, "[a]ll inmates' [outgoing] mail . . . shall be opened and inspected for contraband and

to intercept cash, checks or money orders." (*Id.* at 327.[1]).  "Contraband" includes "any material prohibited by law or regulation or material which can reasonably be expected to cause physical injury or adversely affect the security and safety of the institution." (*Id.*).  While mail is opened and inspected, outgoing mail is only read "if there is reasonable suspicion to believe the mail contains escape plans, other plans to commit a crime or to violate institutional rules or regulations, or constitutes a crime in and of itself." (*Id.* at 329).  In addition, "[m]ail is read[2] and accepted or rejected based on legitimate interests of order and security." *Id.*  "Outgoing mail will be rejected when the mail contains contraband, escape plans, codes, other plans to commit a crime or to violate facility rules and regulations, is intentionally deceptive, harassing or would constitute a crime in and of itself." (*Id.* at 330).

LCCF notifies an inmate when it rejects outgoing mail in writing via a mail-rejection form. (*Id.* at 327; 330).  The institution may hold mail for up to "48 hours normally" or "72 hours during an emergency." (*Id.* at 327).  If rejected, mail is "photocopied and filed for future reference, prior to return or destruction." (*Id.* at 330).  Inmates are not permitted to "modify institutional stationary in any way and the sender's name, number and living quarter's assignment, in English, must appear on all outgoing mail." (*Id.* at 329).  Inmates are accountable "for the contents of their outgoing letters and deliberate violations may result in a misconduct report." (*Id.* at 330).  It is a "Category 'B' Offense[]" for an inmate to "subject[] another person to abusive, offensive or defamatory language or gestures" and also to fail "to abide by facility correspondence rules or regulations." (*Id.* at 383).  Conviction of a "B" offense carries a

---

[1] Somewhat differently, under the "Procedures" portion of the same regulations, mail is "routinely inspected" as opposed to always.  The parties do no offer any explanation that would harmonize these provisions.
[2] This provision implies that all outgoing mail is read.  However, the provision cited immediately before this language predicates the reading of mail on reasonable suspicion.  The parties do not explain this apparent disconnect as well.

maximum sentence of 120 days of loss of privileges, 30 days of housing restriction, or 120 days loss of good time. (*Id.* at 383).

On June 1 or 2, 2017, Hunnicutt placed a letter in LCCF's outgoing mail. On the outside of the envelope, Hunnicutt drew:



(*Id.* at 652). On June 12, 2017, Defendant Destinee Moore filled out and signed a "Mail Rejection" form because of an "offensive drawing on cover." (*Id.* at 648). Associate Warden of Offender Services and Defendant Stacy Beaird signed as the "Administrative Verification." (*Id.*) According to Defendants, the cartoon characters resemble the Warden, Defendant P. Valdez, and Defendant Katherine Brodie. (*Id.* at 632; 640). Valdez, who had issued Hunnicutt a misconduct report a few days before because of Hunnicutt's comment to her to "get off the Warden's jock" in a written grievance, is depicted as attached to Darth Vader's backside. (*Id.* at 639).

The envelope was returned to Hunnicutt. (*Id.* at 504, 648). After cutting the cartoon off the envelope, Hunnicutt placed the cartoon inside another envelope and into the outgoing mail. (*Id.* at 504; 509). On June 13, 2017, Moore inspected the contents of the envelope and returned the cartoon to Hunnicutt without a rejection slip. (*Id.*). Brodie, however, later prepared a rejection slip informing Hunnicutt that his cartoon constituted "subjecting another person to offensive or defamatory or language or gestures." (*Id.* at 649). The prison mailed out an

envelope with the cartoon inside on Hunnicutt's third attempt. (*Id.* at 657). Hunnicutt was not disciplined for the single frame cartoon or issued a misconduct report.

On June 20, 2017, Hunnicutt placed an envelope addressed to Carol Strick in LCCF's outgoing mail. (*Id.* at 10). Inside was this ten-frame cartoon:



(*Id.* at 17-20). On the outside of the envelope, Hunnicutt wrote:

WARNING LCCF MAILROOM

Prison officials cannot censor letters or punish or retaliate against prisoners just because they criticize or personnel or offend them in some way. Procunier v. Martinez, 416 U.S. 396. 413. 94 S.Ct. 1800 (1974). A removal of cartoons from this letter will result in legal action against person responsible. Let this serve as a notice with intent (You are not above federal law).

(*Id.* at 10).  According to Defendants, Moore is depicted in the cartoon as the individual taking the envelopes to Darth Vader, the Warden.  (*Id.* at 17-20).  Her shirt reads "Munchkin" and Hunnicutt variously refers to her as "Cousin It," "troll," "Witchy Poo," and "Pygmy."  (*Id.*).  Hunnicutt drew Popeye to resemble Brodie, whom he calls "Katherine Cooties," and depicted himself in glasses. (*Id.*).

On June 21, 2017, Moore made a copy of the cartoon and authored a misconduct report. (*Id.* at 10).  She charged Hunnicutt with violating B(14), which punishes an inmate for subjecting others "to abusive, offensive or defamatory language or gestures."  (*Id.*).  In her view, the cartoon was "made to look like [her and] several staff members", depicted her "wearing a shirt with 'munchkin' written on it," and referred to her as "troll, pygmy, cousin it, and idiot," which Moore found "insulting, offensive, and demeaning."  (*Id.*).  Although LCCF personnel permitted the cartoon to be mailed, it appears Hunnicutt was convicted of the charge.  The parties do not specify what punishment Hunnicutt received.

On June 26, 2017, Hunnicutt placed two envelopes in LCCF's outgoing mail.  (*Id.* at 34). In the first, addressed to Carol Strick, Hunnicutt wrote in a letter:

> Dear Carol:
> Don't worry about the mail situation – it's not we haven't been here before. I'll take them to court and win (again) and the stupid little idiots will comply or quick [sic] or get fired. I would love to see the responses to the profiteer's envelopes. If GEO wouldn't hire misfits, morons and inbreds, I wouldn't have so much material to use. …I think it's funny these people are so hellbent on trying to censor what I say, write and draw. They are so clueless – bigger and better have tried to dictate my voice and failed. What makes them think they will succeed. . . . By now you should have the two-page cartoon by now [sic] (if the little mudpuppy hasn't withheld it). Can you believe I received a misconduct report for the cartoon in my outgoing mail? Can you say ignoramus? They provide entirely too much material for me. LOL. Gearing up and preparing for civil action (again). I'll be laughing all the way to the bank.

(*Id.* 40-42).

The other letter, addressed to Lois Ahern, read:

> Hello Lois
>
> . . . Again, I'm experiencing mail censorship, tampering and retaliation. It's like the prisons enjoy handing me money and getting beaten in court over the same issues over and over. This little mudpuppy fresh out of high school keeps withholding my outgoing mail – and the idiot wrote a misconduct report on the contents in my outgoing mail (how stupid can one be?!) I'm glad to be the one to teach this GEO drone a lesson in civil law. Anyway, nothing here to really report – just dealing with local yokels who aren't worth two dead fly's [sic] smashed together. Worthless/useless pieces of garbage who aren't fit to watch over an ant farm. . . . I sent Carol a two page cartoon on my mail experience – I thought it was funny.

(*Id.* 39-40).

On June 26, 2017, Moore prepared a misconduct report charging Hunnicutt with the same offense as on June 21, 2017. (*Id.* at 34). Moore complained that Hunnicutt "once again call[ed] me offensive names" such as "a little stupid idiot, misfit, moron, inbred, and a mudpuppy." (*Id.*) As a result of the misconduct report, Hunnicutt lost twenty days of visitation privileges. (*Id.* at 29).

### B.   Procedure

On July 12, 2018, Hunnicutt sued Destinee Moore, Raymond Smith, Geo Corp, LCCF, M. Valeriano, Stacy Beard, Katherine Brodie, T. Foster, P. Valdez and German Franco in the Fifth Judicial District Court for Lea County, New Mexico. (Doc. 1-1). Hunnicutt alleged "copyright infringement, interference with outgoing mail, retaliatory punishment, negligence and infractions for criticizing prison conditions and personnel in outgoing correspondence." (*Id.*, Compl. at 1). Defendants subsequently removed the action to this Court. (Doc. 1). Seeking to remain in state court, Hunnicutt moved to remand. (Doc. 6). Defendants opposed the motion and separately moved for summary judgment. (Doc. 10; 16).

On March 28, 2019, United States District Judge James O. Browning denied Hunnicutt's motion to remand and screened the complaint pursuant 28 U.S.C. § 1915A. (Doc. 33). Judge

Browning determined Hunnicutt did not state cognizable claims under the Copyright Act of 1976, 17 U.S.C. §§ 101-810, and under 42 U.S.C. § 1983 for violation of prison grievance procedures. (*Id.*) What remained of Hunnicutt's Complaint after screening included Hunnicutt's state-law causes of action and his federal claims for retaliation under the First Amendment against "Smith, Beaird, Brodie, and Moore in their individual capacity[ies]" (*Id.*) Following the Court's order directing Defendants to submit a *Martinez* report, Judge Browning denied their motion for summary judgment without prejudice. (Doc. 38). Defendants filed their renewed motion for summary judgment on November 1, 2019. (Doc. 40). On February 10 and 19, 2020, Moore and Warden Smith, respectively, joined in the renewed motion. (Docs. 53; 59).

## II.    STANDARD

Under Federal Rule of Civil Procedure 56, the Court must enter summary judgment where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the movant crosses this threshold, the non-movant must establish with record evidence the existence of a genuine issue of material fact for trial on the merits. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). If the non-movant is unable to meet this burden, judgment as a matter of law is appropriate. *See id.* In resolving a motion for summary judgement, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Talley v. Time, Inc.*, 923 F.3d 878, 893 (10th Cir. 2019).

III.    **DISCUSSION**

A.      **Hunnicutt's Federal Claims**

During screening, Judge Browning concluded Hunnicutt stated a First Amendment retaliation claim: "[t]aking Hunnicutt's allegations as true, prison officials withheld his outgoing mail, because it contains unflattering or unwelcome opinions, and not out of legitimate penological interests, and then punished Hunnicutt for asserting his First Amendment rights." (Doc. 33). At issue, the parties agree, is Hunnicutt's outgoing mail on June 1 or 2, June 21, and June 26, 2017. A claim of retaliation under the First Amendment comprises four elements: (1) the inmate engaged in protected speech; (2) the prison official's actions caused the inmate "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the adverse action was "substantially motivated" in response to the inmate's protected speech. *Shero v. City of Grove, Okl.,* 510 F.3d 1196, 1203 (10th Cir. 2007).

1.      *June 1 or 2, 2017 outgoing mail*

The Court agrees Hunnicutt did not suffer a cognizable adverse action with respect to the first outgoing mail, sent June 1 or 2, 2017. The undisputed material facts establish that no prison official issued Hunnicutt a misconduct report for the single frame cartoon, Hunnicutt was not disciplined for that incident, and the cartoon ultimately was mailed to the intended recipient, albeit after it was returned to Hunnicutt and delayed by less than thirty days. *See Schroeder v. Drankiewicz*, 519 F. App'x 947, 950 (7th Cir. 2013) (explaining that "a delay of less than two months in sending *a single piece* of personal mail" did not amount to "an injury of constitutional dimension"); *Muhammed v. McKune*, 1995 U.S. Dist. LEXIS 12620, at *7 (D. Kan. Aug. 24, 1995) (ninety-day delay in receiving mail was neither prejudicial nor harmful). Thus, Hunnicutt's retaliation claim as to the single-frame cartoon fails as a matter of law. As for the

remaining outgoing correspondence, the parties dispute whether Hunnicutt speech is protected by the First Amendment.

2.  *Protected speech*

Prison does not strip an inmate of all constitutional protections, but "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *see also Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Thus, an "inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822. The "free flow of incoming and outgoing mail" to and from inmates is among those rights the First Amendment protects. *Burns v. Martuscello*, 890 F.3d 77, 88 (2d Cir. 2018). Inmate correspondence implicates two First Amendment interests, the sender's and the recipient's. *See Procunier v. Martinez*, 416 U.S. 396, 408 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989) (explaining "[c]ommunication by letter is not accomplished by the act of writing words on paper" but "is effected only when the letter is read by the addressee[,]" meaning that "[b]oth parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each").

Nonetheless, an inmate's right to correspond is not absolute. In *Martinez*, the Supreme Court explained a prison may place "a restriction on inmate correspondence that furthers an important or substantial interest" of the institution's administration. *Martinez*, 416 U.S. at 413. Prison officials are afforded "latitude in anticipating the probable consequences of certain speech." *Id.* In recognition of the "inordinately difficult undertaking" of running a prison and in deference to "state penal systems," the Court later clarified that restrictions on speech must be

"reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. "Reasonable" in this context means "more than simply a logical relation." *Id.* Such interests include the maintenance of security, order and discipline, and the rehabilitation of prisoners. *Id.*

Outgoing mail presents less concern than incoming mail. Nonetheless, restrictions on outbound correspondence containing "threats, blackmail, contraband, plots to escape, discuss criminal activities, or otherwise circumvent prison regulations, [are] essential to the protection of prison order and security." *Gandy v. Ortiz*, 122 F. App'x 421, 423 (10th Cir. 2005) (citing *Thornburgh*, 490 U.S. at 411-12). Generally, prison officials may read outgoing, non-legal mail to ensure that an inmate's letter does not impinge on these interests. *See Thongvanh v. Thalacker*, 17 F.3d 256, 258-59 (8th Cir. 1994); *Busby v. Dretke*, 359 F.3d 708, 721 (5th Cir. 2004). "Prison officials, however, may not punish inmates for statements made in letters to outsiders that do not impinge on these important governmental interests." *Gandy*, 122 F. App'x at 423.

Censorship and punishment "simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements" as well as statements that "unduly complain," "magnify grievances," express "inflammatory political, racial, religious or other views," and deemed "defamatory" or "otherwise inappropriate" do not further a cognizable penological interest. *Martinez*, 416 U.S. at 413-16. In *Gandy*, for example, the Tenth Circuit determined that a prisoner stated a claim under Section 1983 when the facility disciplined the inmate for sending a letter to Home Depot "to inform the company of what he believed to be an illegal program being instituted at the prison that would impinge on the business of Home Depot." 122 F. App'x at 422.

Federal courts have upheld under the First Amendment an inmate's use of coarse, insulting, profanity-laced descriptions of prison staff in outgoing mail. *See Loggins v. Delo*, 999

F.2d 364, 365 (8th Cir. 1993) (denying summary judgment to prison where an inmate wrote to his brother about "a beetled eye'd bit—back here who enjoys reading people's mail" and describing the official as a 'dyke' who 'was hoping to read a letter someone wrote to their wife talking dirty sh--, so she could go in the bathroom and masturbate"); *McNamara v. Moody*, 606 F.2d 621, 623, 6 (5th Cir. 1979) (rejecting argument that a total security breakdown would occur from a letter that "charged that the mail censoring officer, while reading mail, engaged in masturbation and had sex with a cat"); *Santiago v. Rabideau*, 2016 U.S. Dist. LEXIS 113056 (N.D. Ill. Aug. 23, 2016) (a letter from an inmate calling the governor a "motherfucker" entitled to First Amendment protection).

In recognizing the difficult task of maintaining order within a prison, however, courts have upheld discipline where the inmate uses outgoing mail as a pretext to communicate directly to the prison official. In *Leonard v. Nix*, 55 F.3d 370, 371 (8th Cir. 1995), for example, the prison disciplined an inmate for "verbal abuse of another person" arising from two letters using "the most vulgar, obscene, and racist epithets against the warden . . . and other prison staff." *Id.* at 371. In determining the discipline did not violate the inmate's free speech rights, the Eighth Circuit drew a "fundamental distinction . . . between permissible and constitutionally protected 'unflattering' remarks about prison staff in personal correspondence directed to a recipient on the outside, and impermissible written abusive language that is directed not to the addressee but at and to the warden." *Id.* at 375 (internal citation omitted). In short, "prison officials disciplined [the inmate] to preserve order, a legitimate penological interest." *Id.*

In *Carrol v. Tucker*, 17 F. App'x 392, 393 (7th Cir. 2001), the Seventh Circuit reached a similar conclusion. There, the inmate was placed in administrative segregation for writing a letter to his wife that included the following:

> Since the nosy fags in the mail room are reading my mail, (spot checkn [sic] as they call it), All I can say is to deal with a different Company that these assholes can varify [sic] is legit! . . . Since I got a ticket for stating in one of my letters Assistant Asshole N[word] Warden Hinsley I thought I would say it again. One more time: Assistant Asshole N[word] Warden Hinsley. Now issue two more tickets you nosy assholes reading my mail.

The court of appeals reasoned that "the derogatory comments in the May 15 letter are clearly directed at and meant to be read by prison employees" and therefore the discipline imposed did not offend the First Amendment. *Id.* at 394.

In this Circuit, the District of Kansas has applied *Leonard* and *Tucker* to grant prison officials qualified immunity. *See Freeman v. Benson*, No., 2017 U.S. Dist. LEXIS 195997, at *6 (D. Kan. Nov. 28, 2017). In *Freeman*, the prison disciplined an inmate over an outgoing email. The email described a program coordinator as a "racist bitch" who was responsible for setting the inmate "back 60 days." *Id.* The correspondence recounted a conversation where the inmate told the coordinator "she would likely suffer a pyrrhic victory behind fucking with me because it was now [the inmate's] turn and [the inmate] write[s] a mean complaint." *Id.* The message further characterized the official as "just too nefariously pompous, just an evil little racist ass White woman,"; expressed happiness that the official was leaving; and proclaimed the official will "never forget [the inmate's] name for as long as she lives" *Id.* The inmate felt the coordinator "needed to find humility or better yet, [he would make] sure humility found her[.]" *Id.* The coordinator had previously warned the inmate against using "derogatory language towards staff in his emails[.]" *Id.*

In granting qualified immunity, the district court found "no clearly established right particularized to the facts of th[e] case." *Id.* at *25. Because neither the Tenth Circuit nor the Supreme Court had decided a factually analogous case, the prison officials had "breathing room" to make a judgment call about unsettled questions of law, even if they are mistaken. Where the

inmate "was not simply telling an outside business that the prison was infringing on its business," the inmate knew the coordinator was reading his email, and the email amounted to a "diatribe" directed at the coordinator "as a vehicle for protest," prison officials were immune from suit. *Id.*

As framed by the case law, the issue here turns on whether Hunnicutt was sending legitimate correspondence to outside persons or was instead directing "defamatory comments" to "the warden and prison staff through the guise of legitimate outgoing communication." *Leonard*, 55 F.3d at 371. Defendants argument that Hunnicutt's objective was the latter carries some force. Hunnicutt's ten-frame cartoon and comments in the letters are certainly offensive, unflattering, and arguably defamatory. They accuse GEO and its employees of profiting off drugging inmates, ignoring Supreme Court precedent, and of believing "their own bullshit." Hunnicutt portrays staff as attached to the Warden's posterior, being walked like a dog on a leash, Nazis and characters such as Darth Vader and Popeye. He calls officials names like "idiots," "miscreants," "Cousin It," "Katherine Cooties," "dumbasses," "Witchy Poo," "little troll," "pygmy," "munchkin," "misfits," "morons," "inbreds," "mudpuppy," "ignoramus," "drone," and "local yokels."

Harassing, abusing, and/or demeaning staff has any number of implications on legitimate penological interests of security and order. Allowing such comments to be made directly to staff would, as Defendants maintain, sets a dangerous precedent. Inmates could easily prey on staff, threatening order at the institution as well as threaten the prison's ability to recruit and retain personnel. Such conduct similarly countermands the prison's duty to rehabilitate inmates to function in polite society. *See Morgan v. Quarterman*, 570 F.3d 663, 667 (5th Cir. 2009) (finding that an inmate's note written on toilet paper to an assistant attorney general that the attorney should "use this to wipe your ass, that argument was a bunch of shit" showed "a

completely unjustified disrespect for authority, expressed in the most unacceptably vulgar form, which would be offensive in mainstream society"). For these reasons, LCCF's prohibition on "subjecting another person to abusive, offensive or defamatory language or gestures" is a valid impingement on speech right in the prison context. *See Martinez*, 416 U.S. at 413-14. It also follows that the outgoing mail cannot serve as a gaping loophole that allows inmates to harass staff with language or statements the inmate could not otherwise get away with in front of staff. *See Leonard*, 55 F.3d at 375.

Evidence also exists that Hunnicutt targeted staff. His grievance and disciplinary files abound with insults to staff. For example, Hunnicutt has called and/or depicted in cartoons a grievance coordinator as "Mr. Bo Jangles," and the "house negro"; the kitchen manager a "fat despicable cow with no credibility"; Brodie a "corrupt bitch and tramp"; prison leadership "Warden Beluga Whale Belly," "Deputy Warden Drunken Irishman," "Deputy Warden Seman[sic]," and "a good spic"; Valdez, the facility bookkeeper, to "get off the Warden's jock" and "pry her lips off the Warden's posterior," among many other colorful characterizations. Hunnicutt denies mentioning staff members here, but "D S'More" is depicted on the rejection slip in the ten-frame cartoon as is a character called "Katherine Cooties." These names obviously represent Defendants Destinee Moore and Katherine Brodie. At the very least, this cartoon shows Hunnicutt knew who read and rejected his first letter on June 1 or 2, 2017. Finally, the June 20, 2017 envelope included a warning to the staff not to remove the cartoon, inviting extra scrutiny. Thus, this version of the facts tends to support Defendants argument that Hunnicutt verbally abused staff and his speech was not protected by the First Amendment.

Defendants, however, ask the Court to determine that Hunnicutt directed his speech at Defendants as a matter of law despite a second, reasonable reading of the material facts. The language in the letters and depictions themselves are not a basis to punish Hunnicutt; their

content is no worse than the descriptions of staff in *Loggins* and *McNamara*, where discipline and censorship offended the First Amendment.  *See Loggins*, 999 F.2d at 365 (referring to "a beetled eye'd bit—back here who enjoys reading people's mail"  and describing the official as a 'dyke' who 'was hoping to read a letter someone wrote to their wife talking dirty sh--, so she could go in the bathroom and masturbate"); *McNamara*, 606 F.2d at 623 (claiming that "the mail censoring officer, while reading mail, engaged in masturbation and had sex with a cat").  Measured against these cases, Hunnicutt's correspondence amounts to an unflattering portrayal or satire of how officials handled his mail and that GEO is in bed with big pharma.

While the fact finder could conclude that the correspondence was directed at staff, examining the evidence in the light most favorable to Hunnicutt and drawing all reasonable inferences in his favor, the opposite conclusion is also possible.  Hunnicutt, who sits on the advisory board of a prison abolitionist organization, is a published artist on prison conditions and uses drawing as a medium to comment on those conditions.  By necessity, he must resort to the prison's outgoing mail system to reach a wider audience.  Carol Strick, an addressee of the some of the correspondence at issue, has been exhibiting and selling Hunnicutt's artwork for twenty years.

Hunnicutt addressed the letters to persons outside the institution, Lois Ahern and Carol Strick, to whom he has sent mail in the past.  Strick, as mentioned, helps Hunnicutt exhibit his work.  While the characters depicted in the ten-frame cartoon are meant to represent GEO staff and the cartoons and June 26, 2017 letters mention names of staff members, there is nothing explicitly directing the correspondence to the staff.  In fact, in the June 26, 2017 correspondence, Hunnicutt is curious "to see the responses to the profiteer's envelopes" suggesting that his intention was to—and Strick did—share the first drawing with a broader audience.  Moreover, in *Leonard* where the Eight Circuit upheld punishment, the prisoner "did not merely know that the

letter might be read, instead he directed his defamatory and abusive comments expressly to the warden and staff for the purpose of making his feelings known to them." 55 F.3d at 375.  In short, the inmate was "certain[] that prison officials would read and copy his letter." *Id*. at 372.

And in *Carroll*, where the prisoner's speech was not protected, the inmate dared staff to discipline him by calling the warden, once again after he had done so in previous correspondence, "Assistant Asshole N [word] Warden Hinsley." 17 F. App'x at 393.  In this case, the undisputed material facts do not establish the same type of predicate.  Here, Hunnicutt's mere mention of staff names and likenesses cannot be proof as matter of law that he directed verbal abuse at staff.  No constitutional right for an inmate to complain about prison conditions in outgoing mail could exist otherwise.  There would be no way to distinguish *directing* insults explicitly at staff, speech that the prison may properly restrict, and *portraying* them in unflattering way to persons outside the institution, speech the First Amendment allows.

*Freeman*, on which Defendants also rely, most strongly supports a finding that the prison properly disciplined Hunnicutt.  2017 U.S. Dist. LEXIS 195997.  Unlike *Leonard* and *Nix*, *Freeman* did not turn on the same type of explicit direction.  In *Freeman*, the inmate wrote an email to a non-inmate mentioning a prison employee and expressing pleasure to see the "nefariously pompous," "evil little racist ass White Woman" staff member leave the prison and recounting a conversation where he had told the staff member that he would write a "mean complaint" against her because she had "set [him] back 60 days." *Id.* at *7-8. The staff member "would likely suffer a pyrrhic victory behind fucking" from the inmate as result of his mean complaint. *Id.* at *8.

But *Freeman*'s holding rested on an immunity from suit that may not be applicable here —to private prison staff such as the GEO employees sued in this case —and which Defendants have not asserted in this motion in any event. *Id.* at *28; *see Richardson v. McKnight*, 521 U.S.

399, 402 (1997). The court in *Freeman* determined that because no clearly established law proscribed punishment on this basis, "[q]ualified immunity gave defendants 'breathing room' to make reasonable judgments about unsettled legal questions—even if their judgments turn out to be mistaken ones." 2017 U.S. Dist. LEXIS 195997, at*28. Ultimately, *Freeman* speaks to a different question than the one before the Court and does not mandate a finding that Hunnicutt directed his speech at Defendants, rather than mentioning them and satirically portraying them to the intended recipients.

Hunnicutt's past disciplinary history shows he is no stranger to insulting staff directly, but that does mean he does not use the mail for legitimate purposes here. Surely, Hunnicutt sent many letters legitimately through the outgoing mail expressing his opinions on prison conditions. Moreover, the regulations that govern outgoing mail—those that Defendants maintain Hunnicutt "clearly" violated and allow for discipline—support an inference that Hunnicutt could send mail criticizing staff without having staff read, much less censor him for it. Under prison rules, staff need "reasonable suspicion to believe Hunnicutt's letters "contain[ed] escape plans, other plans to commit a crime or other plans or to violate institutional rules or regulations, or constitutes a crime in and of itself." Defendants have not articulated any suspicion that would have given them reason for reading Hunnicutt's mail.

While the Constitution may permit prison staff to read mail despite a contrary regulation, the prison regulation lead Hunnicutt to reasonably expect his mail *not* to be read unless he did something giving rise to reasonable suspicion. His correspondence does not contain threats of violence or escape plans and only "subjects" a staff member to insults and violates prison rules to the extent staff had any basis to read the letter in the first place. Taken together, the facts and inferences therefrom give rise to a genuine dispute precluding summary judgment. While Hunnicutt could have been targeting staff, an illegitimate use of outgoing mail is not the only

reasonable conclusion the fact finder could draw: Hunnicutt sent mail to individuals with whom he had previously corresponded that included portrayals to the intended recipients and perhaps even the public of GEO staff in an unflattering ways and opined that GEO was corrupt and held itself above the law in handling his outgoing mail.

Accepting Hunnicutt's version of events, the legitimate interests the prison asserts are not necessarily implicated in the same way as under Defendants' version of the events. There is no threat to institutional security and order in off-color comments to persons that are not prison staff even if those comments are about prison staff. Moreover, despite having authority under prison regulations to destroy mail or otherwise censor all or part of the Hunnicutt's correspondence and notwithstanding their steadfast argument that Hunnicutt's mail threatened the very core of order at the institution, prison staff still allowed Hunnicutt's mail out of facility and, under Defendants' reasoning, to subject "another" to verbal abuse. An inference, therefore, exists that at least some aspect of Hunnicutt's portrayals were worthy of First Amendment protection.

Finally, while polite society may not favor Hunnicutt's comments and depictions, rehabilitation also means exercising First Amendment rights in productive ways, such as satires indirectly commenting on events, even if critical of government. The Court recognizes the legitimacy of Defendants' argument that Hunnicutt directed abuse at the staff and is trying to use the courts as a means of protecting what would not be accepted had Hunnicutt made the same comments in front of the prison staff. But it is a case that must be made to the trier of fact. Absent a valid claim of immunity, the Court is compelled to conclude that save for Hunnicutt's June 1 or 2, 2017 mail, genuine issues of material fact preclude judgment as a matter of law on his claims of retaliation under the First Amendment.

B.      **Hunnicutt's Claims Under State Law**

Hunnicutt alleges in his complaint "state law violations in the nature of censorship, interference with outgoing mail, and negligence" and expressly states "he is proceeding under the New Mexico Tort Claims Act." (Doc. 33, at 21) (citing Doc. 1-1).  In responding to Defendants' motion for summary judgment, Hunnicutt appears to narrow his state law claims to the same alleged retaliation for exercising his right to free speech under the First Amendment. Article II, Section 17 of the New Mexico Constitution enshrines a corresponding right to free speech that the federal Constitution guarantees.  *See* N.M. Const. Art. II, § 17 ("Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.").

This provision of the New Mexico Constitution, however, in not self-executing.  Without legislation that "permits individuals to bring a private lawsuit to enforce rights guaranteed by the New Mexico Constitution," *Barreras v. State Corr. Dep't*, 62 P.3d 770, 776 (N.M. Ct. App. 2003), Hunnicutt has no cause of action.  Hunnicutt relies on Section 41-4-12 of the New Mexico Tort Claims Act for this affirmative legislation.  But even assuming this provision is such legislation, it applies to "law enforcement officers while acting within the scope of their duties." Hunnicutt has not set forth facts that would show that any of the movants, employees of a private corporation that operates LCCF, fall within this description.  The Court acknowledges private contractors likely are not entitled to immunity under the NMTCA, *see e.g. Giron v. Corr. Corp. of Am.*, 14 F. Supp. 2d 1245, 1252 (D.N.M. 1998), but the question here is whether some piece New Mexico legislation affords Hunnicutt a private remedy under Article II, Section 17.  Under the facts presented, the NMTCA does not satisfy this threshold, and Hunnicutt's claims under state law fail.

## IV.    CONCLUSION

For the reasons stated above, genuine issues of material fact preclude judgment as a matter of law on Hunnicutt's claims of retaliation as they relate to the correspondence he sent on June 20 and 26, 2017.  As for the June 1 or 2, 2017 letter and Hunnicutt's state-law causes, Defendants are entitled to summary judgment.

**IT IS, THEREFORE, RECOMMENDED** that Defendants' motion for summary judgment (Doc. 40) be **GRANTED in part** and **DENIED in part**.

_____
KEVIN R. SWEAZEA
UNITED STATES MAGISTRATE JUDGE

**WITHIN FOURTEEN (14) DAYS AFTER A PARTY IS SERVED WITH A COPY OF THESE PROPOSED FINDINGS AND RECOMMENDED DISPOSITION, THAT PARTY MAY, PURSUANT TO 28 U.S.C. § 636(B)(1), FILE WRITTEN OBJECTIONS TO SUCH PROPOSED FINDINGS AND RECOMMENDED DISPOSITION.  A PARTY MUST FILE ANY OBJECTIONS WITH THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW MEXICO WITHIN THE FOURTEEN (14) DAY PERIOD ALLOWED IF THAT PARTY WANTS TO HAVE APPELLATE REVIEW OF THE PROPOSED FINDINGS AND RECOMMENDED DISPOSITION.  IF NO OBJECTIONS ARE FILED, NO APPELLATE REVIEW WILL BE ALLOWED.  PURSUANT TO FED. R. CIV. P. 72(B)(2), A PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE OBJECTIONS.**